IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | **Chapter 15** |
| | : | |
| **Lupatech S.A., *et al.,* [1]** | : | **Case No. 14-11559 (___)** |
| | : | |
| **Debtors in a Foreign Proceeding.** | : | **(Joint Administration Pending)** |
| | : | |

------------------------------------------------------------- x

### DECLARATION OF RICARDO DOEBELI IN SUPPORT OF (I) VERIFIED CHAPTER 15 PETITIONS, (II) FOREIGN REPRESENTATIVE'S MOTION FOR ORDERS GRANTING PROVISIONAL AND FINAL RELIEF IN AID OF A FOREIGN PROCEEDING, AND (III) CERTAIN RELATED RELIEF

I, Ricardo Doebeli, hereby declare as follows:

1.      I am the authorized foreign representative (the "**Foreign Representative**") for the above-captioned debtors (collectively, the "**Debtors**") in a proceeding commenced in the Federative Republic of Brazil (the "**Foreign Proceeding**") pursuant to Article 161 of Brazilian Law 11.101/2005 of February 9, 2005 (the "**Brazilian Business Recovery Law**") (pending before the 2nd Civil Court of the city of Nova Odessa, State of São Paulo (the "**Foreign Court**")).  I am fully authorized to act on behalf of the Debtors with respect to the Foreign Proceeding.

2.      On February 25, 2014, the Foreign Court entered an Interlocutory Order, accepting the filing of the Foreign Proceeding and determining additional documents to be filed with the Foreign Court (the "**Interlocutory Order**").  On March 18, 2014, the Foreign Court

---

[1]      The last four digits of the Taxpayer Registration Number or Tax ID, as applicable, of each of the Debtors follow in parentheses: (a) Lupatech S.A. (01-12); (b) Jefferson Solenoidbras Ltda (01-52); (c) Lupatech – Equipamentos e Serviços para Petróleo Ltda (01-04); (d) Lupatech Finance Limited (none); and (e) Mipel Indústria e Comércio de Válvulas Ltda (01-00).  The Debtors' collective executive headquarters is located at Building C, Rodovia Anhanguera, Km 199 at Rua Arnaldo J. Mauerberg, Distrito Industrial, 13460-000, Nova Odessa – SP, Brazil.

ordered the publication of a public notice informing affected creditors of the filing of the Foreign

Proceeding (the "**Publication Order**").  On April 11, 2014, the Board of Directors of lead-

debtor Lupatech S.A. duly adopted resolutions in both English and Portuguese (the "**Brazilian**

**Board Resolutions**") appointing me to act as each of the Brazilian Debtors' foreign

representative in these Chapter 15 cases.  On April 30, 2014, the equity holders of each of

Jefferson Solenoidbras Ltda, Lupatech – Equipamentos e Serviços para Petróleo Ltda, and Mipel

Indústria e Comércio de Válvulas Ltda duly adopted resolutions (collectively, the "**Quotaholder**

**Resolutions**") appointing me to act as each of those Debtors' foreign representative in these

Chapter 15 cases.  On April 30, 2014, the Board of Directors of Lupatech Finance Limited duly

adopted resolutions (the "**Cayman Board Resolutions**") appointing me to act as its foreign

representative in these Chapter 15 cases.  A copy of the Interlocutory Order is attached hereto as

Exhibit A.  A copy of the Publication Order is attached hereto as Exhibit B.  Copies of the

Brazilian Board Resolutions (in both Portuguese and English) are attached hereto as Exhibit C.

Copies of each of the Quotaholder Resolutions are attached hereto as Exhibit D.  A copy of the

Cayman Board Resolutions is attached hereto as Exhibit E.  A certificate of translation (the

"**Translation Certificate**") is attached hereto as Exhibit F.  English Translations of the

Interlocutory Order, the Publication Order, and the Quotaholder Resolutions are appended to the

Translation Certificate.

> 3.      I submit this Declaration in support of the:  (a) verified Chapter 15

petitions of the Debtors; (b) *Foreign Representative's Motion for an Order Directing the Joint*

*Administration of the Debtors' Chapter 15 Cases* (the "**Joint Administration Motion**"); (c)

*Foreign Representative's Motion for an Order Authorizing the Filing of a Consolidated List of*

*Foreign Proceeding Administrators, Litigation Parties, and Entities Against Whom Provisional*

2

*Relief is Sought* (the "**Consolidated Lists Motion**"); (d) *Foreign Representative's Motion for an*

*Order Scheduling Hearing and Specifying the Form and Manner of Service of Notice*

(the "**Notice Procedures Motion**"); and (e) *Foreign Representative's Motion for Orders*

*Granting Provisional and Final Relief in Aid of a Foreign Proceeding* (the "**Recognition and**

**Relief Motion**").

             4.      In my role as the Chief Executive Officer of Lupatech S.A., I have become

familiar with the history, day-to-day operations, assets, financial condition, business affairs, and

books and records of each of the Debtors. Except as otherwise indicated, all facts set forth in this

Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents;

(c) information supplied to me by other employees, affiliates, officers, or directors of the

Debtors, or by professionals retained by me or the Debtors, including, with respect to matters of

United States bankruptcy law, information provided to me by United States counsel, Shearman

& Sterling LLP ("**S&S**"); or (d) my opinion based upon my experience and knowledge of the

Debtors' operations and financial condition. I am an individual over the age of 18 and, if I am

called upon to testify, I will testify competently to the facts set forth herein.

<u>**Background**</u>

**A.**     **The Debtors' Business**

             5.      The Debtors are part of a group of businesses (collectively, the "**Lupatech**

**Group**") that manufacture highly technical components and deliver specialized services

principally within the oil, gas, and foundry industries in Latin America and, increasingly,

throughout the world. The company is divided into two principal segments. The Products

Segment focuses on the production of industrial valves, synthetic fiber ropes, and other tools for

oil and gas production.  The Services Segment focuses on drilling and pipe servicing for the oil and gas industries.

6.    The Lupatech Group's operations began in 1980 in Brazil and currently consist of 32 separate business units organized into two main business segments, divided into three countries in Latin America – Brazil, Colombia and Argentina.  In 2006, the shares of Lupatech S.A. began trading publicly on the *Novo Mercado* segment of the *Bolsa de Valores, Mercadorias & Futuros de São Paulo*, or the São Paulo Stock, Mercantile, and Futures Exchange, under the symbol "LUPA3."  The *Novo Mercado* segment consists of companies that agree to commit themselves voluntarily to certain corporate governance practices that are more stringent than those strictly required by Brazilian law.

7.    Lupatech Finance Limited ("**Lupatech Finance**"), which is managed by Lupatech S.A. in Brazil and maintains no operations, is organized under the laws of, and registered in, the Cayman Islands.  Each of the other Debtors maintains its registered offices in, and is organized under the laws of, Brazil.

8.    The Lupatech Group's worldwide headquarters is located in Nova Odessa, State of São Paulo, Brazil, and substantially all of the Debtors' directly owned assets are located in Brazil.  However, each of the Debtors currently maintains an asset in the United States consisting of an interest in an undrawn cash retainer deposited with S&S, the Debtors' and the Foreign Representative's United States counsel in connection with these Chapter 15 cases.  These retainers were separately deposited by each of the Debtors and are being held by S&S in a client trust account with Citibank in New York, New York (the "**Client Trust Account**").  To the extent that such funds are not ultimately applied to fees charged and expenses incurred by

4

S&S in connection with the administration of these Chapter 15 cases, each of the Debtors has the right to the return of its funds held in the Client Trust Account.

9.       In addition to its interest in the Client Trust Account, Debtor Lupatech – Equipamentos e Serviços para Petróleo Ltda owns 100% of the equity interests of Jefferson Solenoid Valves U.S.A., Inc., a non-debtor Florida corporation with offices in Miami, Florida and Houston, Texas, with eight employees.  As discussed in detail below, these Chapter 15 cases are not intended to have any effect on any employees or other creditors of the Debtors or their affiliates in the United States, other than with respect to holders (the "**Bondholders**") of the 9.875% Guaranteed Perpetual Bonds, initially issued on July 10, 2007 by Lupatech Finance and guaranteed by each of the other Debtors (the "**Unsecured Bonds**").

10.      In an effort to rationalize its capital structure following recent financial distress described below, the Lupatech Group took steps to streamline its physical and organizational structures and to strengthen its position within key industries.  This process included the divestment of "non-core" assets and an internal restructuring of the entire organization.  The commencement of the Foreign Proceeding and these Chapter 15 cases represents a critical step in the Lupatech Group's efforts to reorganize and recapitalize its business for the benefit of all of its stakeholders, including the Bondholders.

**B.       Corporate and Capital Structure**

11.      Lupatech S.A. is the direct or ultimate indirect parent company of each member of the Lupatech Group.  In total, the Lupatech Group is comprised of 74 legal entities organized under the laws of various jurisdictions around the world.  Attached hereto as <u>Exhibit G</u> is a corporate structure chart depicting the entire Lupatech Group.  Attached hereto as <u>Exhibit H</u> is a simplified corporate structure chart depicting only the Debtors.

12.     On October 10, 2007, Lupatech Finance[2] issued, and each of the other Debtors guaranteed, the Unsecured Bonds in the original principal amount of US$200 million pursuant to the terms of that certain Indenture (as modified, supplemented, or amended from time to time, the "**Indenture**") by and among Lupatech Finance Limited, as Issuer, each of the other Debtors, as Guarantors, The Bank of New York Mellon, as Trustee, Principal Paying Agent, Registrar and Transfer Agent (the "**Trustee**"), and The Bank of New York Mellon (Luxembourg) S.A., as Luxembourg Paying Agent, Transfer Agent and Listing Agent.  The Indenture is governed by New York law.  On June 30, 2008, an additional US$75 million of Unsecured Bonds were issued under the Indenture.  The Unsecured Bonds are United States dollar denominated perpetual bonds with no fixed final maturity date and no sinking fund provisions.  Interest payments on the Unsecured Bonds are payable quarterly in arrears at the rate of 9.875% per annum.  As of December 31, 2013, the total outstanding principal amount of the Unsecured Bonds was approximately US$302.5 million.

13.     The Unsecured Bonds are not registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**").  Instead, they were offered and sold only to qualified institutional buyers, in accordance with Rule 144A under the Securities Act, and to non-U.S. persons outside the United States in accordance with Regulation S under the Securities Act. Following their issuance, the Unsecured Bonds were listed on the Official List of the Luxembourg Stock Exchange and were admitted for trading on the Euro MTF market of the

---

[2]     Lupatech Finance was formed by the Lupatech Group under the Companies Law (2004 Revision) of the Cayman Islands for the express purpose of issuing the Unsecured Bonds.  Lupatech Finance has no assets, has no obligations other than the Unsecured Bonds, and prior to the commencement of the Foreign Proceeding, engaged in no business that is unrelated to the Unsecured Bonds.  Lupatech Finance is currently in the process of amending its corporate documents to allow for the issuance of the New Notes (defined below).

Luxembourg Stock Exchange.  Trades of the Unsecured Bonds are processed by the Depository

Trust Company (the "**DTC**"), which serves as their central depository.

14.    Other than the Unsecured Bonds, the Lupatech Group's most significant

debt obligation consists of convertible debentures (the "**Debentures**") issued by Lupatech S.A.

in the original principal amount of R$320 million on April 15, 2009, with an aggregate

outstanding amount, as of December 31, 2013, of approximately US$179.1 million.  The

Debentures were issued in Brazil under Brazilian law and are denominated in Brazilian *reais*.[3]

92.5% of the aggregate outstanding amount of the Debentures is owned by a single Brazilian

investor, BNDES Participações S.A. ("**BNDESPAR**"), a wholly-owned subsidiary of the

Brazilian Development Bank.

15.    Lupatech's total indebtedness at the end of the fourth quarter of 2013 was

US$851.1 million.  As described below, a significant amount of this debt must be voluntarily

restructured as a condition precedent to the implementation of the Debtors' Proposed Plan

(defined below).  As of December 31, 2013, the Lupatech Group reported current assets of

US$161.2 million and current liabilities of US$754.4 million.   For the 12 months ended

December 31, 2013, the Lupatech Group reported total revenue of US$241.3 million.

**C.    Events Leading to the Filing of these Chapter 15 Cases**

16.    The Lupatech Group's current financial distress is the result of several

factors, including an aggressive process of more than 20 acquisitions mostly executed prior to

the 2008 global financial crisis, a lack of integration between units with significant synergy

potential, the global economic crisis that commenced in 2008, intense international competition,

excessive leverage in light of economic conditions, and changes in the investment plans of

---

[3]    According to the Brazilian Central Bank, as of April 17, 2014, one Brazilian *real* (R$) was equal to 0.445
United States dollars (US$).

Petróleo Brasileiro S.A., or Petrobras, Brazil's state-owned oil company and the Lupatech Group's single largest customer.

17.     Lupatech's operations focused predominantly on manufacturing operations until 2006.  Following its public offering in 2006, which increased its financial resources, the Lupatech Group began to expand its activities through the acquisition of several companies whose operations were geared toward oil services operations.  Proceeds from the issuance of the Unsecured Bonds and the Debentures were also used, in large part, to fund such acquisitions, which substantially increased the Lupatech Group's total indebtedness.

18.     The global financial crisis that began in 2008 led to lower than expected utilization of all of the Lupatech Group's plants, equipment, and services.  This low utilization rate combined with increased leverage from debt issuances contributed to a rapid deterioration of the Lupatech Group's financial position.

19.     Since at least early 2012, the Lupatech Group has been experiencing serious liquidity shortfalls and, as a result, it has been unable to make investments necessary to grow its operations and reduce its backlog.  At the same time, marked appreciation of the U.S. dollar versus the Brazilian *real* has significantly increased costs associated with interest expense on the Unsecured Bonds in terms of Lupatech's consolidated Brazilian *real* results.

20.     Beginning on April 30, 2012, a series of general meetings of Debenture holders were held, at which Lupatech S.A. obtained a series of extensions to make payments under the Debentures.  Notwithstanding the willingness of BNDESPAR to compromise and attempt to facilitate an improvement in the Lupatech Group's financial position, however, Lupatech S.A. has been unable to fund any payments on the Debentures since 2012.

21.     On April 10, 2013, the Lupatech Group announced publicly that it would be unable to pay interest due on the Unsecured Bonds.  On July 11, 2013, the Lupatech Group announced that it failed to pay interest due on the Unsecured Bonds on July 10, 2013, and that as a consequence, trading of the Unsecured Bonds on the Luxembourg Stock Exchange was suspended.  The Lupatech Group subsequently failed to make additional interest payments on the Unsecured Bonds on October 10, 2013, January 10, 2014 and April 10, 2014.

22.     In early 2013, the Lupatech Group began to engage in negotiations with its significant creditor constituencies, including a subset of the Bondholders led by BroadSpan Capital (the "**Ad Hoc Group**") and BNDESPAR.  During this period, the Lupatech Group engaged Bank of America Merrill Lynch Banco Múltiplo S.A. ("**BAML**") as a financial advisor to assist in negotiations with its significant creditor groups.  Those negotiations eventually led to the agreements that form the basis for the commencement of the Foreign Proceeding and these Chapter 15 cases.

23.     In addition, during this period the Lupatech Group (a) divested non-core assets in an effort to stabilize its cash position and focus on its principal business, (b) executed a series of actions to reduce costs and expenses, and to gain efficiency and productivity, and (c) renegotiated contracts, all in an effort to restructure the Lupatech Group's operations.

**D.      The Foreign Proceeding and the Proposed Plan**

24.     After a long period of negotiations with the Ad Hoc Group and other creditors, the Debtors agreed to the terms of a joint prepackaged reorganization plan for the restructuring of the Unsecured Bonds (the "**Proposed Plan**"), which was filed with the Foreign Court on February 5, 2014.  The Proposed Plan is predicated on the voluntary restructuring of certain other debt, including the Debentures.  A copy of the Proposed Plan, which was filed with

9

the Foreign Court in both Portuguese and English, is attached hereto as <u>Exhibit I</u>.  Together with

the Ad Hoc Group, the Debtors determined that the Proposed Plan could be best achieved

through expedited insolvency proceedings.

25.    On November 26, 2013, the Debtors commenced the solicitation of votes

of the Bondholders to approve the Proposed Plan (the "**First Solicitation Period**").

Simultaneously with, and to facilitate, the Proposed Plan, Lupatech Finance launched a consent

solicitation (the "**Release Solicitation**") requesting the consent (the "**Consent**") of the

Bondholders for the release (the "**Release**") of the guarantees given under Article XI of the

Indenture by the Argentinean guarantors Válvulas Worcester de Argentina S.A., Jefferson

Sudamerica S.A., Industria y Tecnología en Aceros S.A. and Esferomatic S.A. (collectively, the

"**Argentine Entities**").

26.    The expiration time to tender Unsecured Bonds into the Proposed Plan and

to return the required Consents in connection with the proposed Release was originally set as

5:00 p.m. (Eastern Standard Time) on December 26, 2013, which is consistent with the time

period requirement for exchange offers under the Securities Exchange Act of 1934, as amended.

27.    On December 18, 2013, the Debtors announced that the expiration time

for tendering Unsecured Bonds into the Proposed Plan and providing the required Consents

would be extended from 5:00 p.m. (Eastern Standard Time) on December 26, 2013 to 5:00 p.m.

(Eastern Standard Time) on January 10, 2014.  As of the date the Foreign Proceeding was

commenced, Bondholders of $233,685,000.00 in aggregate principal amount of the Unsecured

Bonds, representing 84.98% of the total principal amount thereof, had validly approved of the

Plan.  An additional $4,251,000.00 in aggregate principal amount of Unsecured Bonds were

tendered by the January 10, 2014 deadline for a total tendered amount of $236,588,000.00,

representing 86.03% in principal amount of the Unsecured Bonds, but those additional tenders were technically invalid as of the date the Foreign Proceeding was commenced due to incomplete or defective documentation. Subsequent to the commencement of the Foreign Proceeding, each of those deficiencies was cured. In addition Bondholders holding $1,348,000.00 in principal amount of Unsecured Bonds voted to approve the Proposed Plan but elected not to receive Shares or ADSs under the Proposed Plan and were therefore not required to tender their Unsecured Bonds into the DTC's Automatic Tender Offer Program, or ATOP, system. As a result, the total principal amount of Unsecured Bonds validly approving the Proposed Plan was $237,936,000.00, representing 86.52% in principal amount of the Unsecured Bonds.

28.      On January 13, 2014, the Debtors announced the extension of the deadline to provide Consents consenting to the Release to 5:00 p.m. (Eastern Standard Time) on January 24, 2014. As of 5:00 p.m. (Eastern Standard Time) on January 24, 2014, the Consents of Bondholders of 57.72% of the principal amount of the Unsecured Bonds had been received. As a result, the Debtors and the Argentine Entities entered into a Fourth Supplemental Indenture with the Trustee on January 30, 2014 releasing the guarantees given by the Argentine Entities and removing them as parties to the Indenture. Also on January 30, 2014, the Debtors, the Trustee and The Bank of New York Mellon (Luxembourg) entered into an Amended and Restated Indenture, restating the Indenture so as to incorporate in a single document all amendments made from the date of issuance of the Unsecured Bonds through the date of the Fourth Supplemental Indenture.

29.      As a result of the successful Release Solicitation, the Debtors do not need to commence any proceeding in respect of the Argentine Entities in order to consummate the

transactions contemplated by the Proposed Plan.  However, the Debtors did determine, in

consultation with the Trustee and the Ad Hoc Group, that these Chapter 15 cases would be

necessary to secure a stay of potential proceedings against the Debtors in the United States

pending approval of the Proposed Plan by the Foreign Court, and to obtain the cooperation of the

Trustee and the DTC in effecting the terms of the Proposed Plan in the United States by (a)

obtaining the Court's recognition of the Foreign Proceeding as a foreign main proceeding and (b)

recognizing and enforcing the Proposed Plan in the United States, after it is approved by the

Foreign Court.[4]

30.    The Foreign Proceeding was commenced under the Brazilian Business

Recovery Law on February 13, 2014.  That law provides for a restructuring process known as a

*recuperação extrajudicial*, which is similar to scheme of arrangement proceedings in many other

jurisdictions and roughly analogous to a prepackaged chapter 11 case in the United States.  For a

plan of reorganization to be approved under the Brazilian Business Recovery Law, it must be

accepted by all creditors or by more than 60% in amount of each class of impaired creditors

subject to the plan.  After a debtor files a plan approved by a sufficient number of creditors, a

Brazilian court must be satisfied that all applicable legal requirements, including the filing of

financial statements, creditor lists, and other documents, and the publication of notices to

affected creditors, have been fulfilled.  Once the Proposed Plan is approved, or *homologated*, by

the Foreign Court, it will be binding on all affected creditors, including any dissenting creditors.

31.    The Proposed Plan does not directly affect any of the Debtors'

stakeholders except the Bondholders.  Following homologation of the Proposed Plan in Brazil

and approval under Chapter 15 of Title 11 of the United States Code, Lupatech Finance will

---

[4]    The Foreign Representative intends to file a separate motion for recognition and enforcement of the
Foreign Plan in the United States to be heard after the Proposed Plan is approved by the Foreign Court.

issue to Bondholders new notes (the "**New Notes**") in a principal amount equal to 15% of the

aggregate outstanding principal and accrued and unpaid interest under the Unsecured Bonds.

Additionally, as provided for in the Proposed Plan, Lupatech S.A. will issue to Bondholders who

tendered their Unsecured Bonds in the Proposed Plan (including those Bondholders who tender

in the further solicitation period referred to below) shares in its capital stock (the "**Shares**"), or

American Depositary Shares ("**ADSs**") representing Shares, at an issuance price representing the

remaining 85% of the outstanding principal and accrued and unpaid interest on the Unsecured

Bonds.  The issuance of the New Notes and the Shares and/or ADSs will be conducted in

compliance with applicable securities laws in the United States and Brazil.  The material terms

and conditions of the new indenture that will govern the New Notes are set forth in Annex 5.2 to

the Proposed Plan.

        32.      Each ADS will represent one Share.  The ADSs and Shares will be issued

at an exchange price equal to R$0.25 per Share, and in an aggregate amount equal to 85% of the

outstanding aggregate principal and accrued and unpaid interest under the Unsecured Bonds.

Such ADSs and Shares will be issued by Lupatech S.A. in a capital increase approved by

Lupatech S.A.'s Board of Directors, following approval by Lupatech S.A.'s current shareholders

of an increase to its authorized capital.  Lupatech S.A.'s existing shareholders hold a right of first

refusal over the issuance of such Shares, and may elect to exercise such right to acquire such

Shares at face value for cash at the stated exchange price of R$0.25 per Share.  To the extent that

Lupatech S.A.'s current shareholders exercise such rights of first refusal, the amount of Shares

and ADSs available for distribution in accordance with the terms of the Proposed Plan will

decrease, and the cash received by Lupatech S.A. in exchange for such Shares will be distributed

on a *pro rata* basis to the Bondholders and other creditors in accordance with the terms of the Proposed Plan.

33.    As noted above, as of the commencement of the Foreign Proceeding Bondholders representing 86.52% in aggregate principal amount of the Unsecured Bonds validly tendered their Unsecured Bonds into, and voted to approve, the Proposed Plan.  Because of this significant creditor support, which satisfies relevant approval thresholds under the Brazilian Business Recovery Law, and because to date the Debtors have received no objections to the Proposed Plan in the Foreign Proceeding, the Debtors anticipate that the Foreign Court will homologate the Proposed Plan.

34.    The capital increase to be approved by Lupatech's Board of Directors will enable the exchange of Unsecured Bonds for Shares or ADSs by the Bondholders and the capitalization of other claims in accordance with the terms of the Proposed Plan.  However, under applicable Brazilian law, existing shareholders of Lupatech S.A. have preemptive rights to subscribe for an increase of Lupatech S.A.'s Share capital that is not offered to the public.  Such preemptive rights may be assigned by the existing shareholders to other parties, however. Therefore, in order to accomplish the capitalization of claims contemplated by the Proposed Plan, at least one existing shareholder of Lupatech S.A. must assign its preemptive rights to the Bondholders and the other creditors that will receive equity in connection with the Proposed Plan.  The Foreign Representative anticipates that a sufficient number of Lupatech S.A.'s existing shareholders will assign their preemptive rights so as to enable the Bondholders and other creditors to subscribe for Shares or ADSs as contemplated by the Proposed Plan.  Because Lupatech S.A. is a publicly-held company with widely dispersed shareholders, it would not be

14

practicable under Brazilian law to structure a capital increase for the benefit of the Bondholders and other creditors after the capital increase contemplated by the Proposed Plan.

35.    In addition, under Brazilian law, the Shares and ADSs to be issued in the capital increase described above must be registered in the name of the beneficial owners of such securities, necessitating action by any Bondholders that wish to receive Shares or ADSs under the Proposed Plan.  In order to achieve this, under the Proposed Plan Bondholders tendered their Bonds into the ATOP system, notifying the Debtors of their election to receive Shares or ADSs, and granting a power of attorney to The Garden City Group, Inc., the agent under the Proposed Plan, to execute Share subscription bulletins on their behalf.   While all Bondholders are eligible under the Proposed Plan to receive Shares or ADSs in exchange for their Unsecured Bonds, it is not possible as a matter of Brazilian law to deliver such Shares or ADSs to Bondholders that do not take these actions during the First Solicitation Period or the Second Solicitation Period (as defined below).

36.    The Debtors believe that some or all of the outstanding 13.97% of Bondholders that did not tender their Unsecured Bonds in favor of the Plan may have failed to do so because they (a) were not qualified to tender their Unsecured Bonds during the First Solicitation Period under applicable law, or (b) missed the deadline to vote on the Proposed Plan and therefore did not tender their Unsecured Bonds into it.  In order to maximize the opportunity for all Bondholders to receive Shares or ADSs, on May 22, 2014, the Debtors commenced a second solicitation of Bondholders to tender their Unsecured Bonds in exchange for the Shares or ADSs (the "**Second Solicitation Period**").  This second solicitation has been structured in compliance with applicable securities laws to permit all holders of Unsecured Bonds to tender those securities in exchange for the new securities to be distributed pursuant to the terms of the

Proposed Plan.  In conjunction with the Second Solicitation Period and the commencement of

these Chapter 15 cases, and in order to facilitate the distribution of Shares or ADSs to all

Bondholders, the Debtors distributed invitations and sent or published notices of the Second

Solicitation Period directly to the Bondholders through normal commercial channels (including

through the Trustee and DTC).  The Second Solicitation Period will remain open until June 23,

2014, which date will be extended by the Debtors to the date that is approximately 10 days prior

to the expiration of the period for Lupatech S.A.'s shareholders to exercise their preemptive

rights in respect of the new Shares and ADSs (the "**Preemptive Rights Expiration Date**"), if

such date occurs after June 23, 2014.  The Debtors expect that the Preemptive Rights Expiration

Date will occur approximately 30 days after the entry of an order by the Court enforcing the

Proposed Plan in the United States.

37.    The Debtors have taken all appropriate steps to ensure that all

Bondholders were informed of their rights and obligations under the Proposed Plan in

preparation for the commencement of the Foreign Proceeding and were given the opportunity to

vote on, and tender their Unsecured Bonds into, the Proposed Plan.  To ensure a full and fair

opportunity for all Bondholders to exchange their Unsecured Bonds for the new Shares and

ADSs to be issued pursuant to the Proposed Plan, the Debtors have commenced, and notified the

Bondholders of, the Second Solicitation Period notwithstanding that they have already achieved

more than sufficient Bondholder support for homologation of the Proposed Plan under Brazilian

law.[5]  The Proposed Plan provides that, following entry of an order by the Court recognizing and

enforcing the Proposed Plan within the United States, the Debtors will issue a notice to the

---

[5]     The Second Solicitation Period ensures that all Bondholders will have the opportunity to receive their *pro rata* share of Shares or ADSs, but, as it is a second and separate exchange allowing the remaining Bondholders to participate in the full consideration to be paid under the already-approved (by more than sufficient Bondholder support) Foreign Plan, it does not constitute a re-opening of the voting period on the Foreign Plan.

Bondholders informing them of such approval and of the imminent issuance of the Shares and

ADSs.   The Foreign Plan provides that any remaining portion of the Unsecured Bonds that is not

converted into new Shares and ADSs in accordance with the terms of the Foreign Plan (as a

result of a Bondholder's failure to submit the necessary subscription information in compliance

with applicable Brazilian law) will be automatically and finally discharged following the

issuance of the Shares and ADSs.

38.     The consensual resolution of a significant amount of the Lupatech Group's

debt other than the Unsecured Bonds is a condition precedent to the effectiveness of the

Proposed Plan.   Most significantly, BNDESPAR and, potentially, other holders of the

Debentures must agree to exchange their Debentures into new *real* denominated debentures

representing 15% of the aggregate outstanding amount of the Debentures and, if they so elect,

Shares in an aggregate amount equal to 85% of the outstanding aggregate principal amount and

accrued and unpaid interest under the Debentures at the exchange price of R$0.25 per Share.

BNDESPAR, as a subsidiary or the Brazilian Development Bank, may not hold more than 33%

of Lupatech S.A.'s issued share capital, and the Proposed Plan provides that it therefore may be

issued additional new *real* denominated debentures representing its right to additional equity if

the conversion described above would otherwise lead to its holding more than 33% of Lupatech

S.A.'s Shares.

39.     In addition, (a) no less than R$52 million of the Lupatech Group's secured

debt must be restructured by a six-year extension of maturity, (b) no less than R$15 million of

the Lupatech Group's unsecured debt owed to parties affiliated with the current shareholders of

Lupatech S.A. must be restructured on terms identical to the restructuring of the Debentures

described above, and (c) no less than R$192 million of the Lupatech Group's unsecured or

17

partially secured debt must be exchanged for either (i) debt bearing an interest rate of 3.00% per annum, with payments commencing four years from the effective date of the Proposed Plan and principal amortized over a period of eight years commencing with the first payment of such debt, or (ii) Shares at the exchange price of R$0.25 per Share.

40.     The Proposed Plan also provides that its recognition and enforcement in the United States in a proceeding commenced pursuant to the Bankruptcy Code, or some other similar measure, is a condition precedent to its effectiveness.  In consultation with the Trustee and the Ad Hoc Group, the Foreign Representative therefore prepared and filed these Chapter 15 cases.  To avoid potentially irreparable harm to the Debtors' creditors and businesses (including a potential event of default under the Proposed Plan, as described below) and to facilitate the Foreign Proceeding, the Foreign Representative seeks an immediate stay within the territorial jurisdiction of the United States against the Trustee and any Bondholders that may attempt to commence actions against the Debtors in the United States.  The Foreign Representative also seeks recognition, after notice and a hearing, of the Foreign Proceeding as a foreign main proceeding.

41.     In addition to the relief described herein, the Foreign Representative anticipates filing a motion for the entry of an Order recognizing and enforcing the Proposed Plan and the Foreign Court's plan confirmation, or *homologation*, order in the United States, authorizing and directing the Trustee, the DTC, and any other necessary party to take certain administrative actions necessary to implement the terms of the Proposed Plan, and granting the Trustee and the DTC certain rights and protections in the exercise of their duties under the Indenture and in accordance with the terms of any order of the Court.

## Requests for Recognition and Related Relief[6]

42.    In connection with the filing of these Chapter 15 cases, the Debtors have submitted the Joint Administration Motion, the Consolidated Lists Motion, the Notice Procedures Motion, and the Recognition and Relief Motion.  In addition to the facts set forth above, factual bases for relief under each of these motions is set forth below.  I believe, after consultation with counsel, that the relief requested by each of the motions is necessary to maximize value for all of the Debtors' creditors through the Foreign Proceeding and to properly administer these Chapter 15 cases.

### A.    Joint Administration Motion

43.    Concurrently herewith, the Foreign Representative filed the Joint Administration Motion seeking entry of an order directing joint administration of these Chapter 15 cases for procedural purposes only, and providing that parties in interest shall use a consolidated caption to indicate that any pleading filed relates to the jointly administered Chapter 15 cases.

44.    I believe that joint administration of these Chapter 15 cases is warranted because the Debtors' financial affairs and business operations are closely related and because it will ease the administrative burden of these cases on the Court and interested parties.  I can confirm that the various notices, motions, hearings, orders, and other pleadings in these cases will affect all of the Debtors.  With five affiliated Debtors, each with its own case docket, I believe that the failure to jointly administer these cases would result in numerous duplicative pleadings filed for each issue and served upon separate service lists.  I also believe that such

---

[6]    Capitalized terms used but not otherwise defined in this section have the meanings ascribed to them in the relevant Motion.

duplication of substantially identical documents would be wasteful and would unnecessarily burden the Clerk of the Court (the "**Clerk**").

45.     Moreover, I have been advised that joint administration will permit the Clerk to use a single docket for all of the Debtors' cases and to combine notices to creditors and other parties in interest.  I have further been advised that joint administration will protect parties in interest by ensuring that they will be apprised of the various matters before the Court.  I believe that the proposed caption set forth in the Joint Administration Motion should be approved as the modified caption for these Chapter 15 cases.

46.     I believe that the rights of the respective creditors of each of the Debtors will not be adversely affected by joint administration of these cases inasmuch as the relief sought in the Joint Administration Motion is purely procedural and not intended to affect substantive rights.  I have been advised that each creditor and party in interest will maintain whatever rights it has against the particular Debtor against which it allegedly has a claim or right.[7]  I have also been told by my counsel that the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.  Finally, I have been advised that if the requested relief is granted, the Court and the Clerk will be relieved of the burden of entering duplicative orders and keeping duplicative files, and supervision of the administrative aspects of these cases by the Office of the United States Trustee for the Southern District of New York will be simplified.  Therefore, I believe that the relief requested in the Joint Administration Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

---

[7]     It should also be noted that, because each of the Debtors either issued or guaranteed the Unsecured Bonds, all of the Bondholders have similar claims against all of the Debtors under the Indenture and related transaction documents.

**B.      Consolidated Lists Motion**

47.      Concurrently herewith, the Foreign Representative has also filed the Consolidated Lists Motion seeking the entry of an order authorizing the Foreign Representative to file a consolidated list identifying the names and addresses of the authorized foreign administrators of the Debtors, parties to litigation pending in the United States involving any of the Debtors, and all persons and entities against whom the Debtors seek provisional relief pursuant to Section 1519 of the Bankruptcy Code.

48.      I can confirm that the identity of the Bondholders is, in large part, known only to the nominees and DTC participants acting on behalf of such Bondholders, and that the Debtors' advisors presently maintain computerized lists that contain the noticing information for those nominees and DTC Participants.  Those nominees and DTC Participants will be listed on the Debtors' consolidated Bankruptcy Rule 1007(a)(4) list.   I can also confirm that, as of the date hereof, none of the Debtors believes itself to be party to any litigation pending in the United States.  Therefore, and because these Chapter 15 cases are intended to affect an identical group of creditors with respect to each of the Debtors, I believe that the relevant information may be consolidated and utilized efficiently to provide interested parties with the information required by Bankruptcy Rule 1007(a)(4).

49.      I submit that the filing of a consolidated Bankruptcy Rule 1007(a)(4) list serves the interests of efficiency and will conserve the resources of all parties in interest, including the Court.

50.      Therefore, I believe that the relief requested in the Consolidated Lists Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

21

C.    **Notice Procedures Motion**

51.    Concurrently herewith, the Foreign Representative has also filed the Notice Procedures Motion seeking the entry of an order approving (a) the form of notice of the Chapter 15 petitions, the entry of the Provisional Relief Order, the deadline to object to the proposed Final Order, and the Recognition Hearing, (b) the manner of service of the Recognition Hearing Notice, and (c) the manner of service on the Master Service List of any pleadings in these Chapter 15 cases.

52.    I can attest that the Debtors have many creditors, potential creditors, and other parties in interest, that received actual notice or notice by publication of the Foreign Proceeding and many of whom may need to be provided with notice of the Provisional Order, the proposed Final Order, the Recognition Objection Deadline, the Recognition Hearing, or other papers filed in these Chapter 15 cases.  Under the facts and circumstances of the Debtors' Chapter 15 cases, I submit that service of the Recognition Hearing Notice and other papers in the manner proposed in the Notice Procedures Motion will provide parties in interest due and sufficient notice of the relief requested in the Recognition Motion, the associated objection deadline and hearing dates, and of any other papers that may be filed in these Chapter 15 cases.

53.    Furthermore, I believe that the Recognition Hearing Notice provides multiple efficient ways for any party receiving such notice to obtain copies of pleadings filed in these Chapter 15 cases, as it provides a website address, email address, and phone number that can be used to obtain critical documents including the Recognition Motion, the Provisional Order, and the proposed Final Order.  Additionally, I believe that service by the Foreign Representative of all pleadings that it files in these cases by United States Mail (or, if necessary or expeditious, its foreign equivalent) first class postage prepaid, on the Master Service List is an efficient and effective way to provide notice to such key parties in these cases.  At the same time,

22

I believe that such proposed procedures will not overburden the Foreign Representative with the significant costs associated with copying and mailing all the various documents filed in these cases to the entire matrix of putative creditors and other parties.

54.    Therefore, I believe that the relief requested in the Notice Procedures Motion is necessary and appropriate and is in the best interests of the Court, the Debtors, their creditors, and other parties in interest.

**D.    Recognition and Relief Motion**

55.    Concurrently herewith, the Foreign Representative has filed the Recognition and Relief Motion seeking entry of the (a) Provisional Order:  (i) granting an interim stay of execution against the Debtors' assets in the United States and applying Section 362 of the Bankruptcy Code in these Chapter 15 cases on an interim basis pursuant to Sections 1519(a)(3) and 105(a) of the Bankruptcy Code and (ii) granting such other and further relief as the Court deems just and proper, and (b) Final Order:  (i) granting the verified petitions in these Chapter 15 cases and recognizing the Foreign Proceeding as a foreign main proceeding pursuant to Section 1517 of the Bankruptcy Code, (ii) permanently enjoining all parties from commencing or taking any action in the United States to obtain possession of, exercise control over, or assert claims against the Debtors or their property, and (iii) granting such other and further relief as the Court deems just and proper.

56.    As detailed in the Recognition and Relief Motion, I believe that there is a compelling case for recognition of the Foreign Proceeding as a foreign main proceeding.  I have been advised by my counsel that the Foreign Proceeding is a "foreign proceeding" and that I am a proper "foreign representative," as those terms are defined in the Bankruptcy Code.  I have been further advised that these cases were duly and properly commenced by filing the Petitions for Recognition accompanied by all fees, documents, and information required by the

Bankruptcy Code and the Bankruptcy Rules, including:  (a) corporate ownership statements; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer the Foreign Proceedings of the Debtors, (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of the filing of the Petitions for Recognition, and (iii) all entities against whom provisional relief is being sought (or their DTC participant representatives and nominees); (c) a statement identifying all foreign proceedings with respect to the Debtors that are known to the Foreign Representative; and (d) certified copies of the Interlocutory Order, the Publication Order, the Brazilian Board Resolutions, the Quotaholder Resolutions, and the Cayman Board Resolutions.

57.     My counsel has also advised me that the automatic stay is one of the most fundamental protections provided by the Bankruptcy Code.  I have been advised that it halts all collection efforts, harassment, and foreclosure actions against debtors and provides them with the necessary breathing room to step back from and attempt to resolve the financial pressures that caused a bankruptcy filing.

58.     I believe that the Debtors may suffer irreparable harm if a stay of actions by the Trustee or recalcitrant Bondholders in the United States is not granted by the Court.  For example, under Section 7.2 of the Proposed Plan, the Proposed Plan will "be considered immediately in default and the debt will be considered immediately due and payable if" the Trustee, at the direction of the Bondholders, notifies Lupatech S.A. that a request for bankruptcy proceedings has been filed against any Lupatech group company, and is not dismissed within 45 days from the date of the summons in such case.  As a result, an involuntary filing against any of the Debtors or their affiliates in the United States could result in the collapse of the Proposed Plan and failure of the Foreign Proceeding.  In any case, I believe that any such filing would

cause significant disruption to the Debtors and their management at this stage of their

restructuring process.  Preventing any such filing or any other enforcement action that could

disrupt the Foreign Proceeding or threaten the Debtors' foreign estates is necessary to ensure the

success of the Foreign Proceeding, which the Debtors anticipate will result in their successful

reorganization and a fair distribution to the Bondholders and other creditors, pursuant to orders

of the Foreign Court.

59.    I also believe that the Debtors' creditors and other stakeholders will suffer

little, if any, harm as a result of the requested provisional relief as it will merely preserve the

status quo and enable the swift approval of the Proposed Plan by the Foreign Court.  To the

extent that any Bondholder wishes to voice objections to the Proposed Plan, such objections

would properly be (and may be) heard by the Foreign Court, and therefore the Debtors' creditors

will not be adversely affected by a stay in the United States.  In addition, pursuant to the terms of

the Provisional Order, any party that believes itself to be adversely affected by the provisional

stay requested by the Debtors will be permitted to move the Court for relief from such

provisional stay.  I believe that granting the requested provisional relief will benefit the Debtors'

creditors and stakeholders because it will ensure that the value of the Debtors' assets and

business will be maximized for the benefit of all stakeholders.

60.    I can attest that the Foreign Proceeding is pending in Brazil before the

Foreign Court.  I can further attest that, as set forth in detail in the Recognition and Relief

Motion, Brazil is the center of each of the Debtors' main interests.  Among other things, the

Debtors maintain the majority of their operations, hold the majority of their assets, carry out the

majority of their management functions, and have the majority in number of their creditors in

Brazil.  Therefore, Brazil is clearly ascertainable by third parties as the Debtors' center of main interests.

61.     Finally, as described in the Recognition and Relief Motion, and as discussed with counsel, I understand and believe that recognizing the Foreign Proceeding and granting the relief requested therein is consistent with the purpose of Chapter 15 of the Bankruptcy Code and the public policy of the United States.

62.     Therefore, I believe that the provisional and final relief requested in the Recognition and Relief Motion is necessary and appropriate and is in the best interests of the Debtors, their creditors, and other parties in interest.

## **Conclusion**

63.     Based on the foregoing, I believe that the relief being requested at the outset of these Chapter 15 cases is well-justified, necessary under the circumstances, in the best interests of the Debtors and their creditors, and should be granted.

I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief, and that (a) the copy of the Interlocutory Order attached hereto as Exhibit A is a true and correct copy of the same as entered by the Foreign Court, (b) the copy of the Publication Order attached hereto as Exhibit B is a true and correct copy of the same as entered by the Foreign Court, (c) the copies of the Brazilian Board Resolutions attached hereto as Exhibit C are true and correct copies of the same as adopted by Lupatech S.A.'s board of directors, (d) the copies of the Quotaholder Resolutions attached hereto as Exhibit D are true and correct copies of the same as adopted by the equity holders of each of the other Brazilian Debtors, (e) the copy of the Cayman Board Resolutions attached hereto as Exhibit E is a true and correct copy of the same as adopted by Lupatech Finance's board of directors, and (f) the copy of the Proposed Plan attached hereto as Exhibit I is a true and correct copy of the same as filed with the Foreign Court. Translations of the Portuguese language documents attached hereto have been individually certified by the person responsible for such translations as provided in the Translation Certificate attached hereto as Exhibit F.

Dated: São Paulo, Brazil
       May 22, 2014

                                    By:    Ricardo Doebeli,
                                    As:    Authorized Foreign Representative of the
                                           Debtors